**SUPERBIRD FARMS, INCORPO-RATED, Plaintiff–Appellee, Cross–Appellant,**

v.

**PERDUE FARMS, INCORPORATED, Defendant–Appellant, Cross–Appellee.**

Nos. 91–1312, 91–1397.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 22, 1992.

Decided July 16, 1992.

Brent Stuckey (argued), Mark Ewing, Hart, Bell, Deem, Ewing & Stuckey, Vincennes, Ind., for plaintiff-appellee.

Barry Sullivan, Joel T. Pelz, Jenner & Block, Chicago, Ill., Marilyn R. Ratliff, Alan N. Shovers, Kahn, Dees, Donovan & Kahn, Evansville, Ind., C. Lamar Garren (argued), Piper & Marbury, Baltimore, Md., for defendant-appellant.

Before COFFEY and KANNE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

KANNE, Circuit Judge.

This case arose from a turkey growing agreement ("the Agreement") between plaintiff-Superbird Farms, and the predecessors of defendant-Perdue Farms, which provided that Superbird would raise Perdue's young turkeys to maturity. Under the Agreement, Superbird's compensation in large part depended upon the number of turkeys it returned to Perdue. Superbird brought this suit because it claims that Perdue did not deliver as many young turkeys as the Agreement required.

Superbird's complaint sought recovery for breach of contract and fraud, and also sought punitive damages. Count I, the breach of contract count, claimed that Perdue had refused to deliver turkeys in the numbers required under the Agreement. In Count II, Superbird claimed that Perdue fraudulently induced Superbird to enter into an amendment to the Agreement ("the Renewal Agreement"). Count III sought punitive damages on the fraud claim, and for Perdue's allegedly oppressive conduct in breaching the contract.

The case went to trial on October 9, 1990. At the conclusion of the evidence, the district judge directed a verdict against Superbird and in favor of Perdue with respect to the fraud and punitive damages counts. On the breach of contract count, the jury returned a verdict in Superbird's favor in the amount of $1,034,000. In response to post-trial motions, the district judge ordered a remittitur of that verdict to $849,-379.19, which Superbird accepted.

Perdue appeals from the breach of contract judgment. It argues that the district judge erred in determining that certain provisions of the Agreement were ambiguous and in failing to give one of Perdue's proposed instructions. Perdue also challenges the sufficiency of the evidence to support the damage award on the contract count. Superbird, in turn, cross-appeals from the directed verdict entered in Perdue's favor on the fraud and punitive damages counts, and argues that it presented sufficient evidence to allow both of these counts to go to the jury. Because this is a diversity case, we follow the law of the forum state, Indiana. *Autocephalous Greek–Orthodox Church v. Goldberg & Feldman Fine Arts*, 917 F.2d 278, 286 (7th Cir.1990).

I.

Superbird entered into the Agreement on June 1, 1979, with Armour and Company.[1] The Agreement provided that Superbird would grow Armour's young turkeys to maturity in Superbird's range houses and would then return the turkeys to Armour. Superbird did not receive turkeys from other processors. Under the terms of the Agreement, Armour, and later Perdue, supplied the feed and medication for the turkeys and decided when mature turkeys would be slaughtered at its plant. The Agreement required Superbird to maintain the range houses in sanitary condition, and to follow Armour's instructions regarding the care of young turkeys. Armour and Perdue also monitored Superbird's farm manager, who had been an employee of Armour.

Under the Agreement, Superbird's compensation generally depended upon the volume of turkeys it received from Armour. Paragraph 3 of the Agreement regulated the volume of turkeys. That paragraph read:

3. *Volume of Young Turkeys to be Delivered and Cared For:*

(a) As each Range House is completed, Armour shall deliver to Grower, and Grower shall accept from Armour and care for, one flock of young turkeys to be cared for in such Range House. Subsequently, as each such flock has achieved maturity and is removed by Armour for further processing pursuant to paragraph 11 hereof, Armour shall thereupon deliver to Grower, and Grower

---

1. Armour assigned its rights and obligations under the Agreement to Shenandoah Valley Poultry Co., Inc. Subsequently, the Agreement was assigned to Perdue.

shall accept and care for, additional flocks of young turkeys.

(b) Armour and Grower contemplate that Armour will deliver to Grower, and Grower will care for, four flocks of young turkeys per fully operational Range House for a maximum of 32 flocks consisting of a total of 300,000 young turkeys in each 12 month period (prorated for any shorter period) throughout the term hereof after eight fully operational Range Houses are constructed by Grower, subject to adjustment as provided in paragraph 17 hereof....

Paragraph 17 allowed the volume specified in ¶ 3 to be adjusted in certain circumstances. That paragraph read:

17. *Adjustment of Guaranteed Volumes:*

Notwithstanding the provisions of paragraph 3 hereof, Armour shall have the right to adjust (i) the number of young turkeys in a given flock delivered to a Range House, (ii) the grow-out period thereof, and (iii) the gender of same, with a view to adjusting the various weights of young turkeys to be grown to maturity; provided, however, Armour covenants that any such adjustment will not adversely affect the levels of compensation Grower could expect to receive pursuant to paragraph 8 hereof from the volumes contemplated by paragraph 3 hereof.

The initial term of the Agreement expired on December 1, 1984, but Superbird exercised its option to renew the Agreement for an additional term of five years. That option provided that the Agreement could be renewed "upon the same terms and conditions (except that the compensation to be paid by Armour to Grower shall be determined on the basis of rates and fees then prevailing for comparable services and facilities in the State of Indiana.)" The option to renew the contract did not require Armour's consent, but ¶ 21 of the Agreement gave Armour an option to terminate the contract after June 1, 1984, for an agreed price.

On April 26, 1985, the parties entered into the Renewal Agreement, which revised the compensation method under the Agreement. Under the original Agreement, Superbird had been compensated by a fee calculated primarily on the basis of each head of turkey returned to the processing plant. This figure was adjusted by a placement fee for each head delivered to Superbird and a feed conversion bonus payment, designed to encourage Superbird to make efficient use of Armour's feed. The Renewal Agreement changed the basis of Superbird's compensation from the number of turkeys returned to Perdue to the number of pounds of turkey returned. That figure was to be adjusted by Superbird's performance, measured against the average performance of turkey growers in the region. After the new payment system took effect in March 1985, Superbird was unprofitable in 1985, 1986 and 1987.

At trial, Superbird claimed that Perdue breached the Agreement by failing to deliver 300,000 turkeys annually to Superbird. Furthermore, Superbird insisted that as Perdue reduced its deliveries to Superbird it failed to increase Superbird's compensation in accordance with ¶ 17. Perdue claimed that it had no duty to deliver annually 300,000 turkeys to Superbird and that Superbird had ceased operations because it was poorly managed and had failed to meet the husbandry requirements of the Agreement. In support of those claims, Perdue pointed to a cholera epidemic which struck Superbird's flocks during 1987. Perdue insisted that Superbird did not take appropriate measures to stem the epidemic and that the epidemic caused Superbird, in September 1987, to cease operations. Superbird responded that it ceased operations because it had not received enough turkeys from Perdue to be profitable. As the verdict demonstrates, the jury accepted Superbird's version of the events.

II.

On appeal, Perdue first argues that as a matter of law it did not breach the contract because the unambiguous terms of the Agreement did not require it to provide

300,000 young turkeys annually to Superbird. The district judge found that ¶ 3(b) of the Agreement was ambiguous and allowed the jury to use extrinsic evidence introduced by Superbird to interpret that provision. Perdue argues that the district judge erred in admitting extrinsic evidence to interpret the contract and in failing to direct a verdict in its favor. Perdue then makes the same argument in a slightly different way: because the contract did not require it to deliver 300,000 turkeys annually, Superbird did not suffer any damages as a matter of law.

Perdue argues that the word "maximum" in ¶ 3(b) demonstrates that the Agreement gave Perdue discretion to decide how many turkeys Superbird would receive. Superbird responds that the contract guaranteed it an annual supply of 300,000 young turkeys. The district judge agreed with Superbird that the contract was ambiguous and would allow a jury to interpret the Agreement in Superbird's favor. Accordingly, the district judge instructed the jury that the Agreement was ambiguous, and that it could consider extrinsic evidence in interpreting ¶ 3(b).

■ Under Indiana law, the existence of a contractual ambiguity is a question of law for the trial judge. *Amoco Oil Co. v. Ashcraft*, 791 F.2d 519, 521 (7th Cir.1986) (applying Indiana law). On appeal, the trial judge's determination is reviewed *de novo. See Orkin Exterminating Co. v. Walters*, 466 N.E.2d 55, 60 (Ind.App.1984). Under Indiana law, "[a] contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation." *Id.; Harris v. Primus*, 450 N.E.2d 80, 86 (Ind.App.1983).

■ In interpreting a contractual provision, the trial judge must first attempt to determine what the contract means. *Amoco Oil*, 791 F.2d at 521. If, as here, the trial judge finds a contract to be ambiguous, the judge must then determine whether the ambiguity is "patent" or "latent." *Id.* "If the ambiguity is patent, oral testimony is inadmissible to eliminate it; if latent, oral testimony is admissible." *Amoco Oil*, 791 F.2d at 520; *see also First Federal Savings Bank of Indiana v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind.1990); *Fiat Distributors, Inc. v. Hidbrader*, 381 N.E.2d 1069, 1071 (Ind.App.1978) (where contract was ambiguous it was proper for the trial court to consider parol evidence to determine the intent of the parties); *English Coal Co. v. Durcholz*, 422 N.E.2d 302, 308–09 (Ind.App.1981). An ambiguity is patent when it "can be cleared up by a careful reading" of the contract or when "it is apparent from the words of the 'contract' that the parties had never agreed on its essential terms." *Amoco Oil*, 791 F.2d at 521.

■ We examine first the district judge's determination that ¶ 3(b) of the Agreement was ambiguous as a matter of law. The relevant part of ¶ 3(b) stated: "Armour and Grower contemplate that Armour will deliver to Grower ... a maximum of 32 flocks consisting of a total of 300,000 young turkeys in each 12 month period." Perdue insists that "maximum" gave it complete discretion to decide the amount of turkeys to be delivered to Superbird up to a maximum of 300,000. Superbird maintains that the word "maximum" modifies the number of flocks, not the number of birds.

Initially, we tend to agree with Superbird that "maximum" modifies the number of flocks. Additionally, Superbird points out that ¶ 17 is titled "Adjustment of Guaranteed Volumes." That paragraph allowed Perdue to adjust the number of turkeys "provided ... that any such adjustment will not adversely affect the levels of compensation Grower [Superbird] could expect to receive pursuant to ¶ 8 hereof from the volumes contemplated by ¶ 3 hereof." We agree with Superbird that the term "Guaranteed Volumes" supports its position that the contract guaranteed it an annual supply of 300,000 turkeys.

Perdue's argument that the contract gave it unfettered discretion to regulate the number of turkeys sent to Superbird is unpersuasive. Under Perdue's interpretation of ¶ 3, Superbird entered into a contract giving Perdue complete discretion to control the supply of turkeys. It is unlike-

ly that the parties entered into such an illusory contract. Although Perdue's interpretation of ¶ 3(b) is somewhat plausible, we cannot say that it is correct as a matter of law. Therefore, we conclude that the district judge correctly found that ¶ 3(b) is ambiguous.

■ We must also examine the district judge's decision to allow the jury to interpret the ambiguous term. Perdue argues that the ambiguity in ¶ 3(b) is patent, and therefore the district judge erred in allowing the jury to construe the contract with extrinsic evidence. *See Amoco Oil,* 791 F.2d at 521. As we noted above, an ambiguity is patent when it "can be cleared up by a careful reading" of the contract, or where "the only reasonable inference is that the parties failed to reach agreement." *Id.* The ambiguity in ¶ 3(b) certainly cannot be resolved by a careful reading of the Agreement. Therefore, to succeed, Perdue must demonstrate that the parties failed to reach agreement.

We reject Perdue's argument because the parties did reach agreement on the fundamental terms of the contract. *Id.* The contract is not "so inconsistent, incoherent, or incomplete that the only reasonable inference is that the parties failed to reach agreement." *Id.* The ambiguity in ¶ 3(b) was easily explained by resort to extrinsic evidence. In fact, the Agreement regulated the business relations between the parties for approximately eight years. Contrary to Perdue's contention, the parties certainly reached agreement on the essential terms of their bargain, and we hold that the ambiguity found in ¶ 3(b) was latent, not patent. The district judge, therefore, correctly instructed the jury that it could consider extrinsic evidence in construing ¶ 3(b).[2]

Perdue next contends that the Renewal Agreement altered ¶ 3(b) of the Agreement as a matter of law. Under Perdue's interpretation, the Renewal Agreement gave it discretion to regulate the volume of turkeys delivered to Superbird. The district judge rejected this argument, and we do as well. The Renewal Agreement altered the compensation system established in ¶ 8 of the original Agreement, but did not state that it altered ¶ 3(b). Paragraph 3 of the Renewal Agreement ratified and affirmed the Agreement in all respects, and did not alter the quantity requirement in ¶ 3(b) as a matter of law.

Alternatively, Perdue argues that it was prejudiced by the district judge's failure to give an instruction negating any obligation on its part of good faith to Superbird beyond the requirements of the contract. The pertinent part of Perdue's tendered instruction read as follows:

... Contracting parties in business transactions are required to comply with their duties as specified in the contract but are not required to do more. If a party complies with its contractual obligations or exercises its rights as provided in the contract, whether its manner of doing so is unfair or inequitable will not supply the aggrieved party with a claim for damages.

In support of its argument, Perdue relies on *First Federal Savings Bank of Indiana v. Key Markets, Inc.,* 559 N.E.2d 600, 604 (Ind.1990). In *First Federal,* the Indiana Supreme court reasoned that "where the terms and the intentions of the parties can be readily determined from the language in the [contract]" it is inappropriate for courts to require a party "to be 'reasonable,' 'fair,' or show 'good faith' cooperation." 559 N.E.2d at 604. Otherwise, the court warned that "[i]t would be impossible for parties to rely on the written expressions of their duties and responsibilities." *Id.* There is one major exception to this principle. A court may be required to presume that parties to a contract were acting in good faith where "the intentions of the parties cannot be readily ascertained because of ambiguity or inconsistency in the terms of [the] contract." *Id.*

■ We proceed cautiously when parties ask us to set aside a jury's verdict and

---

**2.** Perdue also moved for a directed verdict on the ground that the contract was unambiguous. Because we have held that the contract was ambiguous as a matter of law, the district judge did not err in denying the motion for a directed verdict.

order a new trial on the ground that the district judge erred in instructing the jury because we recognize that a new trial will consume substantial judicial resources. *Littlefield v. McGuffey*, 954 F.2d 1337, 1344 (7th Cir.1992); *Needham v. White Laboratories, Inc.*, 847 F.2d 355, 360 (7th Cir.1988). "Our review of jury instructions is limited; they should be construed in their entirety, not in isolation; and reversal is mandated only 'if the jury's comprehension of the issues is so misguided that a litigant is prejudiced.'" *Littlefield*, 954 F.2d at 1344 (quoting *Goldman v. Fadell*, 844 F.2d 1297, 1302 (7th Cir.1988)).

■ The propriety of Perdue's proposed instruction is controlled by Indiana law. *Id.* (a federal court exercising diversity jurisdiction must apply state law to matters of substantive law); *see also Felder v. Casey*, 487 U.S. 131, 151, 108 S.Ct. 2302, 2313, 101 L.Ed.2d 123 (1988). Under Indiana law, the trial court must give an instruction if the instruction is supported by the evidence. *Weller v. Mack Trucks, Inc.*, 570 N.E.2d 1341, 1343 (Ind.App.1991). Thus, we must determine whether the Indiana Supreme Court's pronouncements in *First Federal* concerning good faith apply to this case.

■ This case presents a different issue than the *First Federal* court addressed. Because the jury instructions given by the court did not *require* Perdue to demonstrate its good faith, there was no need to add an instruction *negating* any good faith duty. In any event, a good faith instruction may well have been appropriate because the most important provision of the contract, ¶ 3(b), was certainly ambiguous. *First Federal*, 559 N.E.2d at 604.

The instructions reviewed as a whole conveyed the correct message to the jury. *Littlefield*, 954 F.2d at 1344. The district judge instructed the jury that they could not include any damages in their award to punish Perdue and that sympathy, bias or prejudice could not in any way affect their determination on any question in the case. Another instruction stated that the Agreement specified the duties each party had to the other and the privileges each had a right to exercise. These instructions stated Indiana contract law correctly, and guarded against juror sympathy for Superbird. We hold that the district judge did not err in rejecting Perdue's proposed instruction.

■ Perdue raises an additional argument in support of its proposed good faith instruction. During closing argument, Superbird's attorney mentioned certain evidence related to Superbird's claim for fraud. Perdue argues that the proposed good faith instruction was necessary to cure any prejudice which may have resulted from Superbird's counsel's comments. We cannot agree. At trial, when Superbird's counsel mentioned the fraud evidence, Perdue's counsel promptly objected to those statements and the district judge instructed Superbird's attorney to discuss only the evidence relevant to the breach of contract claim. *Cf., Littlefield*, 954 F.2d at 1346 (the district judge has discretion to determine whether counsel's remarks during closing argument require admonition to the jury). For this reason as well, Perdue's proposed instruction negating any obligation of good faith on its part was unnecessary.

### III.

Perdue raises several challenges to the damage award as remitted by the district judge. We will examine Perdue's arguments in turn.

### A.

■ Perdue argues that, as a matter of Indiana law, Superbird could not recover damages in addition to those set forth in the Agreement's termination provision, ¶ 21. In the alternative, Perdue argues that Superbird could not receive damages for periods extending beyond the term of the contract, which ended in 1989. In reviewing the district court's denial of Perdue's directed verdict motion, we will apply Indiana law. *See Carpetland U.S.A. v. Payne*, 536 N.E.2d 306, 310 (Ind.App.1989) (damage award reversed if contrary to law).

■ We will address first Perdue's claim that the termination provision controls any award of damages to Superbird. The damage award included annual net income for Superbird until 2002. The Indiana contract cases say that: "[a] party is limited in recovery to the loss actually suffered, and he is not entitled to be placed in a better position than he would have been in if the contract had not been breached." *Ind. & Mich. Elec. v. Terre Haute Indus.*, 507 N.E.2d 588, 602 (Ind.App.1987). Perdue argues that the award puts it in a worse position than if it had merely refused to renew the Agreement at the end of its term. Perdue insists that it had the right to terminate the Agreement at any time for a fee prescribed in ¶ 21. The parties understood that ¶ 21 would ensure that Superbird could pay its bond issue if Perdue terminated the Agreement. On January 1, 1985, Perdue could have elected to terminate the Agreement if it paid Superbird $300,000 under ¶ 21.

Perdue's argument at first seems plausible because the contract apparently limited its damages to $300,000. At trial, the district judge awarded Superbird damages exceeding $800,000. But Perdue never exercised its option under ¶ 21 to terminate the contract. Instead, Perdue left Superbird in a precarious position because Perdue reduced its turkey deliveries to Superbird, which meant that Superbird could not pay the interest and principal on its bond issue and was ultimately forced to sell its farm. We agree with Superbird that Perdue's failure to exercise its termination option under ¶ 21 *increased* Superbird's total damages. The district judge correctly held that ¶ 21 did not limit Superbird's damage recovery.

In the alternative, Perdue insists that Superbird was not entitled to any damages for the period after 1989, the contract's termination date. Once again, Perdue insists that the damage award places it in a worse position than if it had performed under the contract. *See Terre Haute Indus.*, 507 N.E.2d at 602.

■ Superbird initially responds that Perdue has waived this issue for purposes of this appeal because Perdue did not raise it in its motion for a new trial. *See In re Kroner*, 953 F.2d 317, 319 (7th Cir.1992) (an issue not presented to the district court is waived on appeal); *United States v. Harty*, 930 F.2d 1257, 1261 (7th Cir.1991). Nevertheless, in its motion for a directed verdict, Perdue requested the district judge to "exclude any evidence concerning Plaintiff's loss of profits after the expiration of the contract for the reason that the evidence presented does not establish any reasonable basis for the Jury to award such damages." We hold that Perdue preserved this issue for appeal.

On the merits, Superbird responds that it had a reasonable expectation of profits continuing after the termination date of the Agreement. Superbird insists that Perdue could foresee the lost profits that would result from its breach of the Agreement.

Under Indiana law, the non-breaching party is entitled to damages that: "may fairly and reasonably be considered as arising naturally, i.e., according to the usual course of things from the breach of the contract itself, or as may be reasonably supposed to have been within the contemplation of the parties at the time they entered into the contract as a probable result of the breach." *Terre Haute Indus.*, 507 N.E.2d at 601. "The test for measuring damages is foreseeability at the time of entry into the contract, not facts existing and known to the parties at the time of the breach; the test is an objective one." *Id.*; *Orto v. Jackson*, 413 N.E.2d 273, 278 (Ind. App.1980). Indiana law allows recovery of lost profits where the evidence "is sufficient to estimate the actual amount of profits lost with a reasonable degree of certainty." *Terre Haute Indus.*, 507 N.E.2d at 601. We will discuss Perdue's challenge to the sufficiency of the lost profit evidence below in part III. B.

■ Superbird argues that Perdue could foresee that if it breached the Agreement that Superbird would be unable to pay its bond issue and would lose its farm and range houses. We agree. The evidence at trial showed that the parties added ¶ 21 to the Agreement to ensure that if

Perdue terminated the Agreement Superbird would be able to pay its bond issue. Perdue was well aware of the bond issue and could foresee that Superbird would suffer substantial losses if it breached the Agreement.

■ Superbird further contends that once Perdue's breach caused Superbird to lose its facility, it was entitled to lost profits. Superbird claims that Perdue's breach deprived it of future profits from its farm. Under Indiana contract law, "the party who suffers from a breach of contract is entitled to recover the benefit of his bargain." *Captain & Co., Inc. v. Stenberg*, 505 N.E.2d 88, 98 (Ind.App.1987); *Von Gonten v. Research Systems Corp.*, 739 F.2d 1264, 1268 (7th Cir.1984). Superbird claims that the award of lost profits gave it the benefit of its bargain because it bargained for a debt-free facility. As we noted above, the inclusion of ¶ 21 in the Agreement supports Superbird's position. When Perdue breached the Agreement, Superbird lost its turkey farm, and was entitled to recover the profits it lost. We hold that Superbird was entitled to recover lost profits for Perdue's breach of contract.

### B.

■ Next, Perdue argues that the damage award as remitted by the district judge was grossly excessive. We apply a federal standard when reviewing a claim that a damage award is excessive. *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir.1990); *West v. Western Cas. And Sur. Co.*, 846 F.2d 387, 399 & n. 6 (7th Cir.1988). In *West*, we noted that use of a federal standard is problematic, *id.*, because in a case in which we exercise pendent or diversity jurisdiction we must apply state substantive law. *Felder*, 487 U.S. at 151, 108 S.Ct. at 2313. Even so, in applying the federal standard, we recognize that under federal or state standards the result is almost always the same. *West*, 846 F.2d at 399 & n. 6; *see also Pincus*, 893 F.2d at 1554.

■ The federal standard is that: we may disturb a jury's damage award only if it is monstrously excessive, the product of passion and prejudice, or if there is no rational connection between the award and the evidence. *Pincus*, 893 F.2d at 1554; *Matter of Innovative Const. Systems, Inc.*, 793 F.2d 875, 887 (7th Cir.1986). *See also Fleming v. County of Kane, State of Ill.*, 898 F.2d 553, 561 (7th Cir.1990). Indiana law is quite similar. Under Indiana law, a jury's damage award "should not be reversed if [it is] within the scope of the evidence before the trial court, and the reviewing court may not reweigh the evidence or judge the credibility of the witnesses who presented it." *Dunn v. Cadiente*, 516 N.E.2d 52, 54 (Ind.1987). To prevail, Perdue must show that the award was "clearly erroneous or contrary to law." *Payne*, 536 N.E.2d at 310.

■ In cases where the district judge has denied a motion for a new trial on damages, we have reviewed for an abuse of discretion. *Innovative Const. Systems*, 793 F.2d at 888. That is so because we recognize the district judge's "superior ability, vis a vis an appellate court, by virtue of having heard the evidence, and observed the jury first hand, to assess the fairness and competence of the jury's award." *Id.*; *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 971 (7th Cir.1983). We have also held that we apply "a somewhat more exacting standard of appellate review" when reviewing a district court's decision to grant a new trial on damages. *Innovative Const. Systems*, 793 F.2d at 888. Even in those cases, however, the district judge's decision "warrants substantial deference." *Id.*

■ In this case the district judge granted a remittitur on his own motion for a portion of the jury's award, but he found that most of the award was supported by sufficient evidence. The district judge gave Superbird the choice of accepting the remittitur or facing a new trial. The district judge, however, effectively upheld most of the award. Thus, we will review the award as remitted for an abuse of discretion, applying the somewhat more exacting standard of review set forth in *Innovative Const. Systems*, 793 F.2d at 888.

*See also Cygnar v. City of Chicago,* 865 F.2d 827, 847 (7th Cir.1989); Fed.R.Civ.P. 59.

■ According to Perdue, the record lacks sufficient evidence to support the jury's damage award as remitted by the district judge because the evidence presented by Superbird through its damage expert, Dr. Rahn, was speculative and went beyond any credible theory of recovery. At trial, Perdue did not respond to Dr. Rahn's testimony with its own damage expert, choosing instead to contest the case on liability grounds.

We shall carefully review Dr. Rahn's testimony to determine if there was an adequate basis in the record for the damage award. Perdue insists that Dr. Rahn based his projections for Superbird's future income on unsupported assumptions.

Dr. Rahn testified that had Perdue provided 300,000 turkeys annually Superbird would have received an additional $29,198 in 1985 and an additional $55,323 in 1986. Dr. Rahn then projected Superbird's net profits for 1987 through 2002, which he determined would be the end of the facility's useful life. Dr. Rahn testified that he based his future earnings projections on the average poundage generated by the facility in 1983 and 1984 before Perdue reduced its placement of turkeys. Dr. Rahn determined that the number of pounds produced by Superbird would increase by 1.5% per year because of predicted genetic improvements in turkeys. Dr. Rahn assumed that Superbird would receive 3.58 cents per pound of turkey, based upon his understanding of Superbird's past compensation range and industry experience. Dr. Rahn did not increase the compensation rate per pound for inflation.

Regarding expenses, Dr. Rahn estimated that the expenses directly related to growing turkeys would average 1.76 cents per pound. Those expenses were not adjusted for inflation. He then estimated that certain expenses not directly related to turkey growing, such as real estate taxes, would increase by 4.5% per year and projected net receipts of between $100,000 and $120,000. From the net receipts, Dr. Rahn deducted debt and interest payments due and $284,196 of scheduled capital expenses for equipment replacement.

Perdue argues that Dr. Rahn's testimony did not provide a sufficient basis for the jury's damage award as remitted by the district judge. Perdue questions several assumptions which Dr. Rahn made in rendering his opinion on lost profits. For example, Perdue argues that there was no basis for Dr. Rahn's assumption that Superbird would be able to obtain young turkeys until 2002. We disagree with Perdue and conclude that Dr. Rahn could make that assumption based upon his knowledge of the turkey industry. Dr. Rahn also had sufficient knowledge of Superbird to assume that it would be able to meet Perdue's performance standards.

Perdue quibbles with several of Dr. Rahn's other assumptions. First, Perdue contends that in calculating lost revenue, Dr. Rahn incorrectly assumed that 85% of the turkeys sent to Superbird would survive until maturity. According to Perdue, the correct figure is closer to 81.5%. Second, Perdue argues that Dr. Rahn failed to take into account the increased expenses that would result if Perdue had delivered 300,000 turkeys. We cannot understand how there could be a significant increase in expenses because the Agreement required Perdue to pay for turkey feed. Third, Perdue claims that the lost profits award for 1987 is too high because it failed to account for the cholera outbreak. Fourth, Perdue argues that had it delivered more turkeys to Superbird fewer would have survived because they would be more densely packed in the range houses. Fifth, Perdue insists that Dr. Rahn incorrectly assumed that there would be further improvements in technology, which would speed up the rate of turkey growth by 1.5% per year.

It is readily apparent that Perdue's challenges to the lost profits calculations have some plausibility. The jury certainly could have taken these criticisms into account and reduced the damage award. Indeed, the jury had that opportunity because Perdue raised almost all of these issues in its cross-examination of Dr. Rahn, and in its

closing argument. The jury chose to believe Dr. Rahn, who was qualified to render an opinion on these issues. *See e.g., United States v. Landmann,* 757 F.2d 916, 919 (7th Cir.1985) (matters of credibility are for the jury). The district judge found that the jury's award of lost profits was amply supported by the evidence. After carefully reviewing Perdue's arguments and the testimony of Dr. Rahn, we can find no abuse of discretion. Thus, we affirm the damage award as remitted by the district judge.[3]

### C.

Perdue's last challenge to the damage award is that the district judge abused his discretion in failing to order a new trial because the jury's damage award demonstrated that it was improperly swayed by Superbird's evidence of fraud and duress. As we noted above, the district judge reduced the jury's award by granting a remittitur on his own motion. At trial, the district judge allowed Superbird to introduce evidence of fraud and oppressive conduct before eventually directing verdicts in Perdue's favor on those claims. Perdue argues that despite the directed verdicts, Superbird's evidence made the jury partial to the home state corporation.

▮ Our review of the district court's denial of a new trial is determined by federal, rather than state law, even in a diversity case. *M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1407 (7th Cir. 1991); *Wassell v. Adams,* 865 F.2d 849, 854 (7th Cir.1989). "[T]he grant or denial of a motion for a new trial is not subject to review by this court, except upon exceptional circumstances showing a clear abuse of discretion." *Cygnar,* 865 F.2d at 835 (quoting *General Foam Fabricators v. Tenneco Chemicals Inc.,* 695 F.2d 281, 288 (7th Cir.1982)); *M.T. Bonk,* 945 F.2d at 1407. A new trial may be granted only if the verdict is against the clear weight of the evidence, *M.T. Bonk,* 945 F.2d at 1407;

*Fleming,* 898 F.2d at 560, or if the damage award is excessive, or if the moving party can establish that the trial was unfair to him or her. *Cygnar,* 865 F.2d at 835.

▮ Perdue's argument that the district judge should have ordered a new trial is flawed in several respects. We have already concluded that the jury instructions were entirely appropriate. Indeed, those instructions prohibited the jury from considering Superbird's evidence introduced in support of its fraud and duress claims when evaluating the breach of contract claim. The district judge, who had the opportunity to observe the jury during the trial, found that its verdict was largely supported by the evidence. In so determining, he found that the jury was not swayed by passion or prejudice. We have upheld his finding that the damage award, as remitted, was supported by sufficient evidence. We can find no reason to second-guess his decision to uphold the jury's award. Therefore, we hold that the district judge did not abuse his discretion in refusing to order a new trial on the ground that the jury was swayed by passion and prejudice.

### IV.

In its cross-appeal, Superbird argues that the district judge erred in directing a verdict in favor of Perdue on Superbird's fraud and punitive damages claims. Superbird argues that it introduced adequate evidence of fraud and oppressive and malicious conduct to create jury questions on both claims.

Once again, we follow Indiana law in reviewing these directed verdicts. *Williams v. Jader Fuel Co.,* 944 F.2d 1388, 1393 (7th Cir.1991); *H.B. Fuller & Co. v. Kinetic Systems, Inc.,* 932 F.2d 681, 686 (7th Cir.1991). In Indiana, the trial court may grant a directed verdict, or motion for judgment on the evidence, "only when

**3.** Perdue also challenges the damage award on the ground that the district judge erroneously resorted to lost gross income rather than lost profits as the measure of recovery. Superbird's counsel, however, referred to lost profits in his closing argument. Therefore, we agree with

Superbird that the district judge meant to refer to lost profits, and not lost gross income in directing a remittitur of the damage award. The district judge apparently followed erroneous language from Perdue's motion for a new trial.

there is no evidence on one or more of the critical elements of the plaintiff's cause of action or the evidence with respect thereto is without conflict and leads only to inferences in favor of the defendant." *Tancos v. A.W., Inc.*, 502 N.E.2d 109, 115 (Ind.App. 1986); *Welch v. Railroad Crossing, Inc.*, 488 N.E.2d 383, 387 (Ind.App.1986).

### A.

■ We will first examine Superbird's fraud claim. In Indiana, a fraud plaintiff must prove:

a material representation of past or existing facts, which representations are false, made with knowledge or reckless ignorance of this falsity, which causes a reliance upon these representations, to the detriment of the person so relying.

*Whiteco Properties, Inc. v. Thielbar*, 467 N.E.2d 433, 436 (Ind.App.1984).

In support of its fraud claim, Superbird claimed that Mike Morris, a Perdue employee, met with Dan Myers, Superbird's Secretary and Treasurer, and made false representations concerning Superbird's future earnings under the Renewal Agreement to induce Myers to sign the Renewal Agreement. During their meeting, Morris explained to Myers that Superbird would receive the same compensation under the Agreement with the Renewal Agreement. Specifically, Morris prepared a demonstration for Myers, using eight flocks, which Superbird had already returned to Perdue. He claimed that those flocks would receive identical compensation under the Agreement and the Renewal Agreement.

Superbird insists that it was defrauded by Perdue because Perdue did not deliver enough turkeys to allow Superbird to profit under the Renewal Agreement. Additionally, Superbird argues that Morris and other Perdue employees knew that the Renewal Agreement would in fact significantly reduce Superbird's compensation, and also knew that Perdue would reduce the number of turkeys shipped to Superbird. The record reflects that under the Renewal Agreement, Perdue greatly reduced Superbird's compensation.

Perdue argues that Myers's testimony demonstrates that he did not rely on the compensation demonstration prepared by Morris. After examining the record, we are certain that the evidence was sufficient to show that Myers relied upon Morris' statements because Myers testified that he understood that under Morris' projections Superbird would receive the same compensation as it had received under the Agreement.

Perdue also argues that the fraud claim must fail because Superbird made its decision to renew the Agreement long before Morris made the alleged misrepresentations. This argument is entirely without merit because Myers testified that Morris' promises induced him to sign the Renewal Agreement in 1985.

To establish fraud, Superbird must also identify a misrepresentation. The record reflects that Morris' calculations at the demonstration were entirely correct. Superbird does not claim that Morris misrepresented the income that would have been earned by the flocks studied in the demonstration or that he concealed information from Superbird. Superbird claims that Perdue failed to deliver a sufficient number of turkeys to guarantee sufficient compensation for Superbird under the Renewal Agreement. Under Indiana law, however, "actionable fraud arises from false representation of past or existing facts, not from representations as to future action or future conduct. It cannot be based upon broken promises, unfulfilled predictions, or statements of existing intent which are not executed." *Kopis v. Savage*, 498 N.E.2d 1266, 1272 (Ind.App.1986); *Whiteco Properties*, 467 N.E.2d at 436; *Rempa v. LaPorte Production Credit Ass'n*, 444 N.E.2d 308, 314 (Ind.App.1983); *Middelkamp v. Hanewich*, 263 N.E.2d 189, 192 (Ind.App.1970).

Superbird argues that it was defrauded because Perdue did not deliver as many turkeys as Morris promised that it would deliver. Because Morris's promises related only to future acts of Perdue, we hold that those statements were not fraudulent as a matter of law. The district judge correctly

directed a verdict in Perdue's favor and against Superbird on Superbird's fraud claim.[4]

## B.

 Next, we turn to Superbird's punitive damages claim. Under Indiana law, " 'punitive damages may be awarded in contract actions whenever the elements of fraud, malice, gross negligence or oppression mingle in the controversy, and it can be shown that the public interest will be served by the deterrent effect of the punitive damages.' " *Bud Wolf Chevrolet v. Robertson*, 519 N.E.2d 135, 136 (Ind.1988) (quoting *Art Hill Ford, Inc. v. Callender*, 423 N.E.2d 601, 602 (Ind.1981)); *see also Hibschman Pontiac Inc. v. Batchelor*, 362 N.E.2d 845, 848 (Ind.1977). An award of punitive damages is warranted only where "a reasonable trier of fact could find such damages proven by clear and convincing evidence." *Bud Wolf*, 519 N.E.2d at 137. The Indiana courts are very hesitant to award punitive damages in contract actions. In *Travelers Indemnity Co. v. Armstrong*, 442 N.E.2d 349 (Ind.1982), the court recognized that "the propriety of the clear and convincing standard is particularly evident in contract cases, because the breach itself for whatever reason, will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent." *Id.* at 363.

In support of its punitive damages claim, Superbird argues that it introduced adequate evidence that Perdue "mingled" fraud, malice, or gross negligence, or oppression, with its breach of the Agreement. Superbird argues that Perdue acted oppressively because Perdue capitalized on Superbird's desire to receive additional turkeys to extract additional concessions from Superbird. *See Vernon Fire & Casualty Insurance Co. v. Sharp*, 349 N.E.2d 173, 184 (Ind.1976) (noting that oppressive conduct includes unlawful exaction, or excessive use of authority.). Superbird insists that

Perdue withheld the delivery of flocks in order to force Superbird to sign the Renewal Agreement, to fire its farm manager, and to undertake unnecessary cleaning in response to the cholera epidemic. Indeed, Myers testified at trial that before he signed the Renewal Agreement Morris told him to "sign [the Renewal Agreement] now or no turkeys." According to Superbird, when Perdue learned that Superbird was approaching insolvency it even attempted to coerce Superbird into leasing the entire farm to Perdue. Alternatively, Superbird argues that Perdue's actions amounted to gross negligence, which warrants the imposition of punitive damages.

We agree with the district judge that Superbird's evidence is insufficient to warrant a punitive damages recovery. Although there was some evidence of oppressive conduct, Superbird did not show by clear and convincing evidence that "elements of fraud, malice, gross negligence or oppression mingle[d] in the controversy." *Bud Wolf*, 519 N.E.2d at 136. Perdue's hard bargaining does not rise to the level of oppressive conduct.

Moreover, the public interest would not be served by awarding punitive damages in this case because Perdue's conduct did not contravene any established public policy. It would be inequitable to hold that Superbird may receive punitive damages for Perdue's breach of a contractual provision that was admittedly ambiguous. Superbird also cannot legitimately claim that Perdue should be punished for enforcing the husbandry provisions of the Agreement because Perdue had the right to enforce those provisions under the contract. In sum, Perdue's breach may have seemed harsh to Superbird but it does not warrant an award of punitive damages. *See Travelers Indemnity*, 442 N.E.2d at 363. The district judge did not err in directing a verdict in Perdue's favor on Superbird's claim for punitive damages.

---

**4.** It is also clear that Superbird did not prove a constructive fraud by Perdue. *See Whiteco*

*Properties,* 467 N.E.2d at 437.

V.

We AFFIRM the judgment of the district court.