The TRUSTEES OF FIRST UNION REAL ESTATE EQUITY AND MORTGAGE INVESTMENTS, an Ohio Business Trust, and Merchants National Bank & Trust Company of Indianapolis, Plaintiffs–Appellees,

v.

Sheldon MANDELL, Defendant–Appellant.

No. 91–3890.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 2, 1992.
Decided March 9, 1993.

Steven K. Huffer (argued), Marvin Mitchell, Mitchell, Hurst, Jacobs & Dick, Indianapolis, IN, for plaintiffs-appellees.

James R. Figliulo (argued), Daniel D. Kasten, Foran & Schultz, Chicago, IL, B. Keith Shake, Scott S. Morrisson, Henderson, Daily, Withrow & Devoe, Indianapolis, IN, for defendant-appellant.

Before RIPPLE and ROVNER, Circuit Judges, and ENGEL, Senior Circuit Judge.[*]

ENGEL, Senior Circuit Judge.

Sheldon Mandell appeals the district court's grant of summary judgment in favor of the Trustees of First Union Real Estate Equity and Mortgage Investments and Merchants National Bank & Trust Company of Indianapolis in this diversity action for declaratory judgment involving the interpretation of a rental clause in a ground lease. For the following reasons, we affirm.

## I. BACKGROUND

The lease at issue covers property located in Johnson County, Indiana upon which stands an approximately 84,000 square-foot K–Mart store. In early 1976, the Trustees of First Union Real Estate Equity and Mortgage Investments ("First Union") equitably owned both the building and land. On April 15, 1976, Merchants National Bank and Trust Company of Indianapolis ("Merchants Bank"), acting as First Union's trustee and the building and land's legal owner, entered into a twenty-five-year ground lease with Cornwall Equities, Ltd. ("Cornwall"). This lease concerns the land only, and will expire on May 31, 2001. The lease provides the tenant with ten successive options to extend the lease for an additional five years per option.

One week after entering into the ground lease, Merchants Bank sold the K–Mart

* Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

building to Cornwall. At the time of sale, S.S. Kresge Company ("Kresge") was operating the K–Mart under a lease dated April 30, 1974. This lease requires the tenant to pay rent of $230,000 per year plus one percent of annual gross sales over $8.5 million. Like the ground lease, the Kresge lease provides for an initial term of twenty-five years and permits ten successive five-year options. The initial term of the Kresge lease expires on May 31, 2000. Cornwall sold the K–Mart and its leasehold interest in the underlying land to Sheldon Mandell ("Mandell") in early 1977. Thus, Mandell is currently Merchants Bank's tenant under the 1976 ground lease and Kresge's landlord under the 1974 building lease.

Of controlling importance to this appeal, the ground lease requires Mandell to pay Merchants Bank $36,000 in annual base rent *plus* fifty percent of any percentage rent Mandell collects from Kresge under the building lease. Of course, Mandell's obligation to pay percentage rent is contingent upon Kresge's ability to generate annual gross sales in excess of $8.5 million. The provision embodying the percentage rent agreement is found at section 5(a) of the ground lease, which provides in full:

> *Section 5. Additional rent.* (a) Tenant shall pay, from time to time, to Landlord as additional rent fifty percent (50%) of any and all percentage rent which S.S. Kresge Company, or its successor or assigns, pays to Tenant under their lease for part or all of the Demised Premises during the initial term *and any period thereof,* promptly after Tenant receives such percentage rent payments. Tenant shall forward with such payment such reports as Tenant shall receive from S.S. Kresge Company showing the computation of percentage rents.

(Emphasis added.)

During closing negotiations, the parties to the ground lease (Merchants Bank and Cornwall) reached an agreement concerning the tenant's rental obligations after the expiration of the initial twenty-five-year term. The resulting rider, section 5(b), reads as follows:

5(b) At the expiration of the initial term of the existing lease with S.S. Kresge Company and upon the execution of a new lease with S.S. Kresge Company, or any successor to said company by merger or corporate reorganization (exclusive, however, of any extension of the existing lease in accordance with the terms thereof), the basic rent payable hereunder shall be increased, from and after the commencement date of such new lease with S.S. Kresge Company, to the lesser of (i) $72,000 per annum, or (ii) an amount equal to $36,000 plus the average of the percentage rentals paid by Tenant to Landlord for the five years immediately preceding the commencement term of such new lease with S.S. Kresge Company. If a new lease is entered into with a party other than S.S. Kresge Company (or any successor to said company by merger or corporate reorganization), then there shall be no increase in basic rent as provided in this Section 5(b).

The question before us is whether the ground lease will require Mandell to continue paying percentage rent to Merchants Bank after the expiration of the initial period of the building lease should both Mandell and Kresge exercise one or more of their respective five-year options to extend.

As with many contract cases, the dispute resulting in this litigation did not arise until many years after the contract's execution. In this case, the parties had no occasion to question the ground lease until early 1990 when First Union decided to sell its interest in the ground lease. The potential buyer refused the deal because of a perceived ambiguity in section 5(a). Specifically, the buyer was concerned with the italicized language in section 5(a) quoted above which reads "and any period thereof." If these words refer to the term "initial term," then percentage rent would seemingly cease upon the expiration of the twenty-five-year period. If, however, the words refer to the term "their lease," then the obligation to pay percentage rent presumably would continue during any extension of the ground lease. Faced with this interpretive dilemma, First Union contacted Mandell request-

ing a position on the percentage rent issue. Not surprisingly, Mandell responded that he understood the lease to mean that percentage rent was collectible only during the initial term.

On June 20, 1990, First Union and Merchants Bank (collectively "Trustees") sued Mandell in the Southern District of Indiana. The two count complaint sought declaratory relief and reformation of the contract to make explicit Mandell's obligation to pay percentage rents during any extension of the Kresge lease. Mandell answered the complaint and raised two affirmative defenses: failure to state a claim upon which relief can be granted and laches. Thereafter, the parties filed cross-motions for summary judgment. On March 11, 1991, Mandell filed a motion for leave to amend his answer to add a *bona fide* purchaser defense against the reformation count. The Trustees objected to this motion arguing Mandell had waived the defense by missing the court's December 1, 1990 deadline for amending the pleadings. The district court sustained the Trustees' objection, but held the motion to amend under advisement pending the summary judgment determination.

The district court granted the Trustees' motion for summary judgment on November 21, 1991, and entered the following declaratory judgment:

> The Tenant's duty under Section 5(a) of the Ground Lease to pay additional rent based on percentage rent payable under the Kresge Lease will continue during any optional renewal or extension period of the Kresge Lease, if both the Kresge Lease and Ground Lease are renewed.

The court dismissed the reformation count as moot. In a well-reasoned entry accompanying its declaratory judgment, the district court began its analysis by noting that the term "and any period thereof" was ambiguous as a matter of law because reasonable people could differ as to whether the phrase referred to "their lease" or "initial term." The court further found the ambiguity to be patent rather than latent, meaning that the ambiguity would be resolved from within the four corners of the document rather than relying on parol evidence. Viewing the ground lease as a whole, the court opined that "[i]t is more likely that the parties included the clause to clarify that the obligation to pay additional rent under the Ground Lease extended to percentage rent received during *any* period of the Kresge Lease." Dist.Ct.Op. at 14 (emphasis in original, footnote omitted). While aware that neither party proffered a perfect interpretation of the ambiguous terms, the court was convinced that having "and any period thereof" refer to "their lease" would result in the least amount of redundancy and surplusage.

## II. DISCUSSION

The parties do not dispute that Indiana law controls this diversity action. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Transamerica Insurance Co. v. South,* 975 F.2d 321, 327 (7th Cir.1992). Our review, of course, is in the fullest sense *de novo,* both as to the district court's grant of summary judgment (*Samuelson v. Durkee/French/Airwick,* 976 F.2d 1111, 1113 (7th Cir.1992)) and to its interpretation of state law. *Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Summary judgment is proper only if the record reveals no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In Indiana, as in other jurisdictions, the touchstone of contract interpretation is to determine the parties' intent. *See First Federal Savings Bank of Indiana v. Key Markets, Inc.,* 559 N.E.2d 600, 603 (Ind.1990); *generally* 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 538, at 55 & n. 40 (1960). Consistent with the foregoing principle, Indiana courts will enforce an unambiguous contract as written, thereby leaving the parties to the positions for which they have bargained. *See, e.g., First Federal Savings Bank,* 559 N.E.2d at 604; *Martin Rispens & Son v. Hall Farms, Inc.,* 601 N.E.2d 429, 436 (Ind.App.1992).

Whether a contract is ambiguous is a question of law for the trial judge (*Superbird Farms, Inc. v. Perdue Farms, Inc.*, 970 F.2d 238, 243 (7th Cir.1992)), again subject to *de novo* review. *Id.; Orkin Exterminating Co. v. Walters*, 466 N.E.2d 55, 60 (Ind.App.1984). The standard for determining contractual ambiguity is whether a reasonable person would find the contract subject to more than one interpretation. *Superbird Farms*, 970 F.2d at 243; *TRW, Inc. v. Fox Development Corp.*, 604 N.E.2d 626, 630 (Ind.App.1992). In applying this standard, courts will give a word or phrase its usual meaning unless the contract, when taken as a whole and considering its subject matter, makes clear that the parties intended another meaning. *Boswell Grain and Elevator, Inc. v. Kentland Elevator and Supply, Inc.*, 593 N.E.2d 1224, 1227 (Ind.App.1992). Additionally, a court must "make all attempts" to interpret a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Bicknell Minerals, Inc. v. Tilly,* 570 N.E.2d 1307, 1316 (Ind.App.1991).

 Moreover, as Judge Posner has noted, "Indiana adheres to the ancient, mysterious, and much-derided distinction between 'patent' and 'latent' ambiguities in contracts and wills." *Amoco Oil Co. v. Ashcraft*, 791 F.2d 519, 520 (7th Cir.1986) (citations omitted). Accordingly, once a court finds a contract ambiguous, it must further determine whether the ambiguity is latent or patent (as the district court here found). *Superbird Farms*, 970 F.2d at 243; *see generally Hauck v. Second National Bank of Richmond*, 153 Ind.App. 245, 286 N.E.2d 852, 862–64 (1972). A patent ambiguity, one that appears on the face of the contract, is capable of resolution by carefully reading the contract. *See Superbird Farms*, 970 F.2d at 243. Courts may not resort to parol or other extrinsic evidence when resolving patent ambiguities. *Superbird Farms*, 970 F.2d at 243; *Indiana–Kentucky Electric Corp. v. Green*, 476 N.E.2d 141, 146 (Ind.App.1985). Moreover, in carefully reading the contract, a court may not examine particular words and phrases in isolation; the parties' intent must be gathered from the contract as a

whole. *See INB Banking Co. v. Opportunity Options, Inc.*, 598 N.E.2d 580, 582 (Ind.App.1992). Finally, a court should resolve the ambiguity in such a way that harmonizes the contract's provisions rather than causes them to conflict. *See Boswell Grain and Elevator*, 593 N.E.2d at 1226–27.

 Moving to the merits of this case, Mandell primarily argues that the district court erred by interpreting the ground lease because section 5(a) is clear and unambiguous. We disagree. The phrase "and any period thereof" *could* refer to "initial term" or it *could* refer to "their lease." We are aware of no rule, grammatical or otherwise, which compels a contrary conclusion. Moreover, and to the parties' disadvantage, the drafters chose not to clarify the ambiguous language of section 5(a) by either expressly defining the term "period" or by using the relevant terms elsewhere in the document in such a way as to suggest specific meaning. In concluding that section 5(a) is ambiguous, we are mindful that our inquiry at this point is not whether the Trustees' proffered interpretation of the ground lease is correct in the ultimate sense, only whether it is reasonable. *See TRW*, 604 N.E.2d at 630. As the district court noted:

> While the proximity of "thereof" to "initial term" may make [Mandell's] connection more grammatically pleasing, the other alternative is *reasonable* also. Different interpretations of the meaning of a term need not be equally compelling to create an ambiguity; that question is relevant during the interpretation stage only.

Dist.Ct.Op. at 9–10 (emphasis in original).

The Trustees offered the district court, and now offer us, considerable extrinsic evidence in support of their interpretation of the ground lease. This evidence takes the form of an affidavit and supporting documents from a former First Union officer present during the ground lease negotiations, deposition testimony of Mandell, and discovery documents authored by Mandell's son. The district court declined the

Trustees' invitation to examine this evidence; so do we. The trial court correctly concluded that the ambiguity is patent and, therefore, can be clarified from within the four corners of the document. Accordingly, we may not consider the Trustees' proffered extrinsic evidence. *Superbird Farms*, 970 F.2d at 243; *Indiana–Kentucky Electric*, 476 N.E.2d at 146.

As for interpreting the meaning of the phrase "and any period thereof," the terms of section 5(b), in our view, go a long way toward discerning the intent of the parties. This section provides for two possible contingencies that may occur upon the expiration of the initial period of the Kresge lease. First, should Kresge and Mandell enter into a new building lease, section 5(b) explicitly requires Mandell to pay the lesser of either double base rent ($76,000) or base rent *plus* Mandell's average percentage rental payouts over the last five years. In the second scenario, should Kresge decide neither to extend nor to renegotiate, then section 5(b) provides that Mandell will be required to pay only the base rent of $36,000 per year. Of course, and unfortunately for the parties, section 5(b) is incapable of deciding this appeal by itself because its terms apply "exclusive ... of any extension of the existing lease in accordance with the terms thereof."

Mandell correctly notes that section 5(b) evidences the Trustees' willingness to accept solely the base rent of $36,000 in at least one circumstance, where Mandell must find a new tenant for the building. What Mandell does not explain, however, is why the Trustees would be willing to forgo rental income over and above the $36,000 base rent in the event that Mandell and Kresge extend as opposed to renegotiate the building lease. Mandell has failed to present, and we have been unable to construct, a principled distinction between extension and renegotiation—as between the same parties—which would explain why the Trustees would require augmented rent in one case but not the other. Quite simply, Mandell's interpretation makes no sense as a matter of the parties' probable intent in executing the ground

lease. Mandell replies that whether the lease makes good business sense "is not a relevant consideration where the plain language of the provision at issue is clear and unambiguous." Aplnt's. Br. at 16 (citation omitted). As a proposition of Indiana law, Mandell's statement undoubtedly is correct. *See First Federal Savings Bank*, 559 N.E.2d at 604. Once a court has established that a contract's terms are ambiguous, however, the common sense of a proffered interpretation becomes a relevant consideration in determining the parties' intent. *See, e.g., Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc.*, 507 N.E.2d 588, 598 (Ind.App.1987) ("In construing a contract, we must adopt the construction which appears to be in accord with justice, *common sense* and the probable intention of the parties in light of honest and fair dealing. [Emphasis added, citation omitted.]").

Moreover, as the Indiana Court of Appeals noted in *Michels v. Dyna–Kote Industries, Inc.*, 497 N.E.2d 586 (Ind.App. 1986):

> We do not look outside an unambiguous contract, but to the extent an instrument is ambiguous we may consider the situation of the parties, their motives in dealing with each other, and the object sought to be accomplished in determining the intent of the parties.

*Id.* at 589 (citation omitted). In this case, Merchants Bank and Cornwall entered into a ground lease for land upon which Kresge was presently operating a K–Mart store. The lease under which Kresge occupied the building requires Kresge to pay the building's owner one percent of the K–Mart's gross annual sales over $8.5 million. Moreover, this obligation will continue at least until the expiration of the building lease's initial term in the year 2000. Section 5(a) of the ground lease clearly provides that Merchants Bank will reap one-half of any percentage rent collected by the building's owner, at least until the initial term of the building lease expires. Thus, the ground lease evinces the clear intent of the parties that Merchants Bank will share in the ex-

pected success of the K–Mart store during the initial term of the building lease.

Section 5(b) of the ground lease pertains to certain of Cornwall's (now Mandell's) rental obligations during the next century. While choosing to ignore the possibility that Kresge and Mandell will opt to extend the building lease, section 5(b) does specifically provide for the contingency whereby Mandell and Kresge are desirous of continuing their business relationship, but on terms different from those of the building lease. In such a case, section 5(b) makes clear that Merchants Bank will continue to receive augmented rent from the ground lease tenant, that is, rent in addition to the $36,000 in annual base rent. Thus, the ground lease further evinces the clear intent of the original parties that Merchants Bank will receive more than base rent in the event that Kresge and Mandell remain parties to the deal, but choose to negotiate a new lease.

It is against this background that Mandell would have us believe Merchants Bank cannot reasonably expect to receive percentage or otherwise augmented rent during an extension of the building lease. Mandell relies heavily upon the final sentence of section 5(b) as proof that, at least in the case of Kresge's moving out at the end of the initial term, Merchants Bank is willing to accept base rent and no more. While we are admittedly perplexed as to why Merchants Bank would accept only $36,000 annually should Kresge leave the deal entirely, this enigma in no way suggests the parties intended the same result should Kresge extend its lease. To the contrary, the parties' use of the word "extension" in section 5(b) of the ground lease suggests that the parties intended Merchants Bank to continue receiving the same rent as in the initial term. For example, Black's defines "extension" in the context of a lease as follows:

> The word "extension," when used in its proper and usual sense in connection with a lease, means a prolongation of the previous leasehold estate. The distinction between "extension" and "renewal" of lease is chiefly that, in the case of renewal, a new lease is requisite, while, *in the case of extension, the same lease continues in force during additional period* upon performance of stipulated act. An option for renewal implies giving of new lease on same terms as old lease, while *an option for extension contemplates a continuance of old lease for a further period.*

BLACK'S LAW DICTIONARY 583 (6th ed. 1990) (emphasis added).

The foregoing inference is further strengthened by considering the effect Mandell's interpretation would have on section 4(a) of the ground lease. This provision governs Mandell's ability to extend the lease, and provides in pertinent part:

> Tenant shall have ten successive options to extend the term of this lease for an additional period of five years on each such option, such extended term to begin respectively upon the expiration of the term of this lease or of this lease as extended and *the same terms and conditions as herein set forth shall apply to each such extended term.*

(Emphasis added.) If section 5(a) actually relieves Mandell of the obligation to pay percentage rents after the initial term, then under no circumstances could the parties extend the ground lease on the same terms and conditions as before. In short, Mandell's reading of section 5(a) effectively renders section 4(a) inoperative. When considered against the inconsistency inherent in the Trustees' interpretation, *i.e.*, rendering the term "initial term" redundant, the latter pales by comparison. As a result, the Trustees' reading resolves the ambiguity in a way that harmonizes the contract's provisions rather than causing them to conflict. *See Boswell Grain and Elevator,* 593 N.E.2d at 1226–27.

In conclusion, when considering section 5(a) with a mind toward common sense and the motivations and objectives underlying the ground lease—as we must under Indiana's authorities—we can only conclude that the original parties intended the phrase "and any period thereof" to refer to the antecedent term "their lease" rather than "initial term." Accordingly, the tenant under the ground lease is bound con-

tractually to pay the landlord percentage rent during any extension of the building lease, should both the building and ground leases be extended.

Lastly, we address briefly Mandell's contention that the district court erroneously refused to consider his motion to amend the answer to add a *bona fide* purchaser defense.[1] Simply put, the district court's decision moots Mandell's argument. As noted above, the district court, despite sustaining the Trustees' objection to Mandell's motion to amend, nevertheless held the motion under advisement pending the outcome of the motions for summary judgment. By his own admission, Mandell wished to apply the *bona fide* purchaser defense solely to the complaint's reformation count. The district court, however, granted only the declaratory relief sought by the Trustees, dismissing the reformation count as moot. With no allegation remaining against which to apply Mandell's proffered defense, the district court was not obliged to revisit Mandell's *bona fide* purchaser argument.

## III. CONCLUSION

For the foregoing reasons, we conclude that Indiana's courts would likely uphold a grant of summary judgment in favor of the Trustees based upon this record. Accordingly, the judgment of the district court is AFFIRMED.

---

1. Additionally, Mandell urges this court to grant his motion for summary judgment as to the Trustees' reformation count based on an application of his proffered *bona fide* purchaser de-

fense. Our analysis of Mandell's motion to amend is equally applicable to his summary judgment argument.