TRW, INC., Appellant (Defendant Below),

v.

FOX DEVELOPMENT CORPORATION, Appellee (Plaintiff Below).

No. 11A04–9010–CV–00468.

Court of Appeals of Indiana, Fourth District.

Dec. 8, 1992.

Rehearing Denied Feb. 19, 1993.

Robert F. Hunt, Frey, Hunt, Hassler & Lorenz, Terre Haute, Kathleen B. Burke, Paul D. Koethe, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for appellant.

Max E. Goodwin, Mann, Chaney, Johnson, Goodwin, Terre Haute, for appellee.

MILLER, Judge.

Fox Development Corp. (Fox) entered into an agreement to manage the construction of TRW, Inc.'s (TRW) building expansion project. The Construction Management Agreement (Agreement) provided that the building would be constructed for a "guaranteed maximum price" of $861,-950—$783,590.91 for materials and labor, and $78,359.09 for Fox's construction management fee. A dispute arose over how much TRW owed Fox. Fox sued TRW for breach of contract. A jury awarded Fox $50,032.11 in compensatory damages—$6,535.30 for wall costs, $13,986.89 for construction management fees, interest, and attorneys fees—plus $750,000 in punitive damages. TRW claims that the written Agreement is unambiguous; therefore, interpretation of the contract was a question of law for the court and should not have gone to the jury.

We agree and reverse.

## FACTS

In 1981, TRW sought bids for the expansion of its manufacturing facility located in Marshall, Illinois. Fox, a newly formed construction company located in Terre Haute, Indiana, submitted a building proposal based on some preliminary discussions with TRW. According to Fox's building proposal, "the construction process [would] integrate the Solarcrete Wall System." R. 304. Solarcrete walls are constructed by blowing high density concrete under high pressure into a polystyrene wall form. The result is a strong, energy efficient wall. Fox was certified by Solarcrete as a Solarcrete area developer and was authorized to use Solarcrete's patented construction methods.

After negotiating the cost of the expansion project, the parties entered into an

agreement whereby Fox would act as the project's construction manager. The pertinent provisions of the nine-page Agreement are:

[Fox] will perform those services which, more specifically hereinafter described, shall include consultation with [TRW] and [TRW's] designated representative, on construction related matters during development of the design and shall consist of the actual management, direction and responsibility for the construction of the Work, [Fox] being an Agent of [TRW] for the purposes of construction and completion of the Work.

\* \* \* \* \* \*

1.2 This Agreement represents the entire Agreement between [TRW] and [Fox] and supersedes all prior representations, negotiations or agreements. When plans and specifications are complete, they shall be identified by amendment to this Agreement. This Agreement shall not be superseded by any provisions of the documents for construction and may be amended only by written instrument by both [TRW] and [Fox].

\* \* \* \* \* \*

4.1 All portions of the Work that the Construction Manager does not perform with his own forces shall be performed under Trade Contracts. The Construction Manager shall request and receive proposals from Trade Contractors and Materials Vendors. Trade contracts and Purchase Orders will be awarded and administered in the name of the Owner by the Construction Manager as the Owner's agent. When the Agreement between the Construction Manager as Owner's Agent and the Trade Contractor and/or Materials Vendors involves an amount in excess of $100.00, the Construction Manager shall secure the approval of the Owner before contracting in the Owner's behalf.

\* \* \* \* \* \*

6.1 The Guaranteed Maximum Price shall be the sum of Eight Hundred Sixty One Thousand Nine Hundred Fifty Dollars ($861,950.00). The Guaranteed Maximum Price shall include only the actual cost of labor and materials furnished to perform and complete the Work and shall include the Construction Manager's Fee.

\* \* \* \* \* \*

7.1 In consideration of the performance of this Agreement, [TRW] agrees to pay [Fox] in current funds as compensation for his services a Construction Manager's Fee fixed in an amount equal to ten percent (10%) of the actual cost of labor and materials furnished to perform and complete the work.

\* \* \* \* \* \*

8.1 [TRW], without invalidating the Contract, may order Changes in the work within the general scope of the Contract consisting of additions, deletions or other revisions, the Guaranteed Maximum Price, and the Contract Time Schedule being adjusted accordingly. All such changes in the Work shall be authorized by Change Order.

8.2 A Change Order is a written order to [Fox] signed by [TRW] or this authorized agent issued after the execution of the Contract, authorizing a Change in the Work and/or an adjustment in the Guaranteed Maximum Price or the Contract Time Schedule."

R. 330–38. Fox's attorney prepared the Agreement and submitted it to TRW before the building plans were completed. In addition to the construction management fee, TRW paid Fox $10,000 to design the project.

When Fox solicited bids for the Solarcrete walls, the bids came in higher than Fox had estimated. In an effort to limit costs, Fox decided to build the Solarcrete walls itself and organized a subsidiary corporation, Crete Construction, for this purpose. James Libke (Libke), a Fox official, testified he had a "handshake agreement" with TRW that Fox (through Crete Construction) would build the walls "with the understanding that whatever it cost, [Fox] would be reimbursed on a periodic basis as the expenses and costs were incurred." R. 363–64.

Crete Construction encountered difficulties in constructing the Solarcrete walls, so Fox hired another subcontractor, Tri–State Solarcrete, to complete the walls. Liens were filed against the TRW project, principally for equipment and subcontract work needed to complete the Solarcrete walls. TRW discharged the liens, and with Fox's consent, deducted the lien payments from Fox's construction management fee.

At trial, Fox claimed TRW owed them $6,535.30 over and above the guaranteed maximum price for materials and labor costs incurred in constructing the Solarcrete walls and that TRW wrongfully withheld $13,986.89 in Construction Management Fees. TRW maintained that the contract was clear and unambiguous and that it had paid Fox all that it was obligated to pay under the guaranteed maximum price provision.

TRW moved for summary judgment before trial, a directed verdict after Fox presented its evidence, and again after presenting its own evidence.[1] However, the judge permitted Fox's breach of contract claim to go to the jury. TRW's Motion to Correct Errors, challenging both the compensatory and punitive damage awards, was overruled.

## DECISION

TRW claims that the trial court erred in denying its motion for judgment on the evidence on Fox's breach of contract claim because TRW's financial obligations to Fox were limited to the guaranteed maximum price set forth in the Agreement. When reviewing the trial court's denial of a motion for judgment on the evidence, we will consider only the evidence most favorable to the nonmovant along with all reasonable inferences therefrom. *Northern Indiana Public Service, Co. v. Stokes* (1986), Ind.App., 493 N.E.2d 175, 178. "We must determine whether there was evidence of probative value supporting each element which would justify submission of the claim to the jury." *Whisman v. Faw-*

*cett* (1984), Ind., 470 N.E.2d 73, 79. If there is any probative evidence or reasonable inferences to be drawn from the evidence or if reasonable people would differ as to the result, judgment on the evidence is properly denied. *Northern Indiana Public Service Co., supra* at 178. A motion for judgment on the evidence should be granted only in those cases where the evidence is not conflicting and susceptible to one inference, supporting judgment for the movant. *Id.* Thus, our role on review is no different from that of the trial court. *See,* 4A Kenneth Stroud, *Indiana Practice, Appellate Procedure* § 12.3 (1990).

### I. The Solarcrete Wall Dispute

TRW argues that since the guaranteed maximum price provision in the Agreement is clear and unambiguous, the issue of whether TRW was liable for cost overruns was a question of law for the court. Fox counters that there were two contracts: 1) the written construction management agreement; and 2) an oral contract that Fox (via Crete Construction) would build the walls and would be reimbursed regardless of whether or not the cost exceeded the guaranteed maximum price.

First, Fox argues that since "the Work" it was hired to manage is defined in the Agreement only as "construction of a building consisting of approximately 41,700 square feet," the contract is ambiguous. According to Fox, what was to be included in "the Work," (and thus the guaranteed maximum price), could only be determined by extrinsic evidence. Thus, Fox argues that it was a question of fact for the jury to determine whether the Solarcrete walls were part of "the Work" it was to perform. The ambiguity of which Fox complains is not relevant to the dispute. It is irrelevant which phase of the construction caused Fox to exceed the guaranteed maximum price. Thus, the issue is whether the term, "guaranteed maximum price," is ambiguous. It is TRW's contention that the guaranteed maximum price is clear and unambiguous—

1. Fox also claimed fraud, conversion and duress. However, the court granted partial summary judgment to TRW on these claims.

that TRW's financial obligations to Fox were limited, as a matter of law, to $861,950. Fox maintains that the guaranteed maximum price was only a target figure.

■ The construction of an unambiguous contract is a question of law for the court. *Bicknell Minerals v. Tilly* (1991), Ind.App., 570 N.E.2d 1307, 1310. If a contract is ambiguous or uncertain and its meaning is to be determined by extrinsic evidence, its construction is a matter for the factfinder. *First Federal Savings Bank v. Key Markets, Inc.* (1990), Ind., 559 N.E.2d 600, 604. A contract is ambiguous where reasonably intelligent minds could find the contract susceptible to more than one interpretation. *Lueth v. Gardner* (1989), Ind.App., 541 N.E.2d 298, 300. We view the contract in the same manner as the trial court. *Bicknell, supra; State Security Insurance Co. v. Ottinger* (1985), Ind.App., 487 N.E.2d 446.

The phrase, "guaranteed maximum cost," and its implications for contracting parties has been addressed by other courts. In *D.A. Davis Const. Co., Inc. v. Palmetto Properties, Inc.* (1984), S.C., 315 S.E.2d 370, the builder submitted a bid which provided that the building would be constructed for a guaranteed maximum cost of $293,850. The builder incurred cost overruns in constructing the building and requested payment in excess of $293,850, which the owner refused to pay. The builder then brought an action to foreclose a mechanics lien against the owner. The South Carolina Supreme Court held that the builder was obligated to construct the building for $293,850. Absent an agreement between the parties that the owner would pay in excess of the guaranteed maximum cost, the builder could "only recover the cost of construction up to $293,850." *Id.* 315 S.E.2d at 372. *Accord A.A. & E.B. Jones Co. v. Boucher* (1974), Colo. App., 530 P.2d 974.

■ A guaranteed maximum price provides a cap on a party's financial obligations. It is the greatest amount a party is required to pay for the contracted services. TRW is obligated to pay Fox for material and labor costs plus construction man-

agement fees up to $861,950. Fox is not entitled to recover monies in excess of this amount. As a matter of law, TRW is not liable to Fox for material and labor costs, or construction management fees in excess of the guaranteed maximum price.

Fox counters that TRW still breached the Agreement because "TRW failed to show that the material and labor costs attributable to Fox's part of the project actually exceeded the GMP [guaranteed maximum price]." Appellee's brief at 24. It was Fox's burden, as the plaintiff, to demonstrate that TRW did not pay Fox what was owed under the contract. Actually, at trial, Fox produced exhibits, elicited testimony, and even admitted that there were cost overruns on the guaranteed maximum price that were attributable to Fox. R. at 233, 404, 659, 959, 961, 975, 981. In sum, Fox's breach of contract claim based on the written agreement should not have been submitted to the jury. Furthermore, we find that Fox did not demonstrate that TRW breached the written Agreement.

Second, Fox claims that it had a separate oral agreement with TRW for the construction of the Solarcrete walls outside of the Agreement and thus outside the confines of the guaranteed maximum price. According to Fox, "TRW was obligated by its oral contract to pay the wall costs whether or not the GMP [guaranteed maximum price] was exceeded." Appellee's brief at 24. TRW counters with the argument that just because Fox decided to build the walls itself does not change the terms of the Agreement.

■ The burden was on Fox to present evidence that an oral agreement existed which excluded the wall costs from the guaranteed maximum price. Under the terms of the written Agreement, only a written change order could alter the terms of the Agreement. *See supra;* contract ¶¶ 1.2, 8.1, 8.2. However, "[e]ven a contract providing that any modification thereof must be in writing may nevertheless be modified orally. However, the modification of a contract, because it is also a contract, requires all the requisite elements of a contract." *Indianapolis v. Twin Lakes*

*Enterprises* (1991), Ind., 568 N.E.2d 1073, 1085, *trans. denied.* Modification requires the assent of both parties. *Burras v. Canal Construction and Design Co.* (1984), Ind.App., 470 N.E.2d 1362, 1367.

■ The record to which Fox cites as support for their claim is as follows:

**Libke [on direct examination]:** Yes, there was a handshake agreement that we would go forward and do this with these insulating qualities about Crete construction and the agreements with the laborer's union and we would build the wall with the understanding that whatever it cost we would be reimbursed on a periodic basis as the expenses and costs were incurred.
R. 363–364.

 \* \* \* \* \* \*

Direct examination of Boyd Johnson (Fox official)

**Johnson:** Whoever was at the meeting at that time. We all walked outside, which I believe to be Mr. Nash [TRW official] and Mr. Harmon [TRW official], and I was absolutely sure that Mr. Krause [TRW official] was at the same meeting. I could be wrong, but I'm pretty sure it was the same meeting. We looked at the property outside and then at the time Jim and I was moving toward our automobile to come back to Terre Haute, and Mr. Harmon walked along with me and him and I were discussing the overage cost and that was going to happen above the number that was fixed.

**Fox's counsel:** Well what did you, sort of thing did you say to him and what did he say to you?

**Johnson:** Well, I just told him that the job was going to cost more money than that, and he implied to me that, again, they had the monies from other budgets, whatever, that was going to be put into this that would take care of that part of it.... Then he assured us, or assured me, anyway, and I think Jim was possibly listening in, that don't worry about the fixed cost. I bring that up because I also said the same thing to Mr. Libke. We had discussed this somewhat and I was real concerned about it because of them wanting to set that number....

**Fox's counsel:** Under the Construction Management Agreement, was Fox to be a contractor on the job as far as actually building anything itself?

**Johnson:** No, sir.

**Fox's counsel:** Did you make a separate agreement between Fox and TRW to actually, for Fox to actually do some of the construction work?

**Johnson:** Yes, we did.

**Fox's counsel:** What was that?

**Johnson:** That was to build the Solarcrete Walls because the prices that came in was far and above what was given to us by Solarcrete Corporation who owned or was the manufacturer himself, I should say.

**Fox's counsel:** Had you made conceptual estimates based on what you learned from Solarcrete Corporation but then found that you couldn't actually get a contractor to bid it at that price?

**Johnson:** Correct.

**Fox's counsel:** So what was the—What was your understanding of the agreement that was made with respect to the Solarcrete Wall?

**Johnson:** That we would go ahead and build them for TRW.

**Fox's counsel:** And how were these walls to be paid for?

**Johnson:** TRW was to pay for them.

**Fox's counsel:** Were they to pay you any profit as a contractor on that?

**Johnson:** No.
R. 759–62.

In addition, our search of the record reveals the following testimony:

**Libke [on cross examination]:** The gist of Mr. Krause's [TRW official] statement was exactly, fellas, we understand that the problems in regards to costs and we don't expect you to put money in our building. That was the gist of his statement. It was honorably received and believed by all persons present at the meeting.

**TRW's counsel:** Okay. I just want to make sure that the jury understands when you made that statement yesterday, that you you're not testifying that

that's exactly what was said, 'regardless of how the figures come out, TRW would be paying the bill.' You're not saying that, are you?

**Libke:** Ask the question again.

**TRW's counsel:** When you testified yesterday, you were asked about what Mr. Krause said and you said that he said he did not—that TRW did not expect Fox to build the building, and then you went on to say regardless of how the figures came, TRW would be paying the bill. Now, did he make that statement or did he not make that statement.

**Libke:** Whether he made that exact quote I cannot remember.

**TRW's counsel:** And anyway—you received—you inferred that he meant that?

**Libke:** Yes. I didn't infer it. He inferred it.

**TRW's counsel:** But you don't remember his words?

**Libke:** I don't believe—I don't believe I do remember his exact quote.[2]

R. at 590–92.

Fox also points to an August 17, 1983 letter from Libke as support for their argument that TRW agreed to pay for the entire cost of the wall construction.[3] This

---

2. Fox officials recall that this conversation occurred either immediately after the parties signed the Construction Management Agreement on September 23, 1982 or sometime in early October, 1982.

3. The exhibit provides in part:

"I should preface the statement of our position on this matter by saying that our initial and continuing intent concerning our construction management responsibility is to oversee the construction of your building expansion project as near an absolute cost figure as possible. In the face of acute financial considerations, we continue with the above objective.

The actual costs of the on-site construction of the building expansion wall system embraces three separate categories:

1. Payroll (includes wages, withholding and union contributions) . . . . . . . . . . . . . $ 54,537.65
2. Equipment rental, equipment repair and service for mobile lifts, compressors, etc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22,323,22
3. Concrete applicator and finisher contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24,573,40

Total $101,434.27

In addition, there are numerous expense incidentals directly connected with the actual construction that are not included in this figure but voluntarily assumed by [Fox]. The above figure represents the actual cost without benefit of profit or contingency based on the spirit and intent of our agreed relationship. Our only meaningful income was to be in the form of construction management fee based on labor and materials. We recognized from the beginning, taking into consideration the suppressed hnp [sic] figure that we would probably have to expend from construction management fee funds some incidental expenses, relating to the actual construction and not connected to construction management operations. We intend to accept that responsibility and loss. Our responsibility was to secure the work in TRW's behalf for the lowest possible amount. After investigating thoroughly the project retail cost of the wall work by "arms lengths" subcontractors, it was estimated that under our direct supervision the wall could be built much more cost efficient. We proceeded under that basis securing union agreements and hiring internal "expertise" to do so. Although the estimated costs were not projected accurately it ended up being far less than any other estimates. In other words, the wall cost was in excess of original conceptual estimates, but far below quotes for the same work. In regard to the bare, less than, cost of

$101,434.27, we have received monies from TRW in the amount of $78,466.27. Again, this figure does not include any incidental expenses, such as gasoline, tools and soft costs, etc. expended or depreciated in actual construction. Such costs we should not, but do, agree to absorb through C.M.F. funds. We do not agree to assume the hard costs of $22,968.17.

The work that was to be done concerning the wall system was to be costed and TRW responsible for same. *We feel it is not equitable to require strict performance within the confines of the estimate, since it was a no profit, no contingency estimate.* Any contract to perform said work would have included profit and/or contingency considerations.

*We are requesting that you accept responsibility and issue a purchase order in our favor in the amount of $22,968.17 to reimburse us for outstanding liabilities in this matter.*

The $101,000 figure also includes payroll of approximately $2800.00 expended to repair storm damage. That has also been included in the $78,000 figure (Invoice No. 1003–83). We do not feel that the funds to offset the "gap" should be paid from [construction management] funds due us. The intended use of those funds was to pay for the operation costs of the construction management function and to deny same, compounds financial need. Our accounting records concerning the above

letter does not demonstrate that TRW agreed to pay Fox over and above the guaranteed price for the construction of the walls. The letter shows that Fox requested that TRW relieve them from strict adherence to the guaranteed maximum price and pay them for the total cost of the walls—ten (10) months after Fox claimed that TRW orally agreed to pay for the walls regardless of their cost. *See supra* n. 2 (emphasized language).

TRW was obligated to pay material and labor costs up to $783,590.91. The testimony to which Fox points merely shows that TRW agreed to pay Fox, as opposed to a third-party subcontractor, for the material and labor costs associated with the walls. There is no evidence that TRW agreed to exclude the cost of the walls from the guaranteed maximum price. We hold that the trial court erred in permitting Fox's claim of an oral contract to go to the jury. Since the contract is not ambiguous, nor was there an enforceable oral agreement, we hold that TRW did not breach its Agreement by refusing to pay Fox more than the guaranteed maximum price for the project.

## II. *The Construction Management Fee Dispute*

 Fox claims that TRW breached the contract by wrongfully withholding $13,-986.89 [4] from Fox's construction management fee. A memo from Libke of Fox to Carl Harmon of TRW authorizes $12,886.89 to be withheld from Fox's construction management fee as follows:

> This memo is to confirm our verbal arrangement and authorization to pay direct the following described outstanding accounts incurred during the Marshall Building Expansion Project and deduct same from monies due our firm in Construction Management Fees. In order to satisfy any future liability and release these accounts, please make the checks payable to both the account identified and Fox Development Corp.

JACK'S TOOL RENTAL, INC. $6,777.49

TRI–STATE SOLARCRETE $6,109.40

> Thank you.

(R. 1075). Fox also authorized TRW to withhold an additional $3,100 from their construction management fee.[5] As a result, TRW overpaid Fox's construction management fee. Accordingly, TRW did not breach the Agreement.

Fox next claims that TRW engaged in "double dipping," i.e., entering payments

---

referenced expenditures are available to you upon request.
(R. 467–68) (emphasis added).

**4.** Fox arrives at $13,986.89, by subtracting $64,-372.20—the amount TRW paid directly to Fox through periodic payments of ten percent (10%)

"Construction Management Fee 10% TRW Building Expansion Project, Marshall, Illinois

| | |
|---|---|
| 54,521.80 x 10% = 5442.18 | $5442.18 |
| Wilpump Concrete Placing settlement | -3100.00 |
| Balance due | $2342.18 |

R. at 1080.

Plaintiff's Exhibit 22, a Fox invoice to TRW for the Solarcrete walls provides:
Costs balanced connected with the equipment, labor and contract (Tri–State Solarcrete) for the erection, concrete application and finish of 13,700 square feet of wall system for the building expansion project.

| | | |
|---|---|---|
| 1. | Erection labor, equipment operations and labor union contributions | $ 54,537.65 |
| 2. | Equipment rental, repair and service | 22,323.22 |
| 3. | Concrete application and finish (Tri–State Solarcrete contract) | 24,573.40 |
| | | $101,434.27 |
| Invoices paid to date for completed work, #'s 1006, 1007, 1002, 1003 (Attached) | | 78,466.10 |
| | "Balance Due | $ 22,968.17 |
| | minus $16,432.89 [*] CMF funds | $ 6,535.30" |

R. at 445 (emphasis added).

of incoming invoices for material and labor—from the construction management fee of $78,-359.09.

**5.** Plaintiff's exhibit 34 consists in part of a Fox invoice to TRW which provides:

under two accounting categories in an effort to inflate expenses and give the appearance that the ceilings for both the guaranteed maximum price and the construction management fee had been met. TRW set up their accounting ledger for the expansion project to reflect three types of expenses: materials and labor, construction management fees, and soft costs. Fox claims TRW double dipped when TRW included the Tri–State Solarcrete ($6,109.40), Mr. Wilson ($3,100), and Jack's Tool Rental ($6,777.49) payments in calculating the $783,591 guaranteed maximum price ceiling for materials and labor, while at the same time TRW deducted those amounts from the Fox's construction management fee.

First, there is no entry under materials and labor or any other category pertaining to a payment to Mr. Wilson, nor is there an entry for $3,100 at all. Therefore, we fail to find any double dipping of $3,100. Second, it was proper for TRW to include the Tri–State Solarcrete and Jack's Tools expenditures in the material and labor costs. They *were* material and labor costs. Third, even if TRW was incorrect in adding the Jack's Tool Rental and Tri–State Solarcrete expenses under the material and labor column, the material and labor costs as provided in Plaintiff's own exhibit 34 so exceeded the guaranteed maximum price that the effect of a $12,886.89 accounting error is of no consequence. As for TRW deducting those costs from Fox's construction

management fee, Fox agreed to this arrangement.

We find no breach of contract and reverse the finding of the trial court. Accordingly, we need not address the issue of punitive damages.

Reversed.

RATLIFF, Senior Judge, and CHEZEM, J., concurring.

---

* $16,428.89 (which we note differs from $16,432.89) is derived by adding:

When $16,432.89 (the construction management fee withheld as per Plaintiff's exhibit 22, i.e., TRW's indirect payments of the construction management fee) is added to $64,372.20 (TRW's direct payments to Fox for the construction management fee consisting of 10% of materials and labor invoices), the total direct and indirect payments on the construction management fee is $80,805.09. Since TRW was obligated to pay only $78,359.09 in construction management fees, TRW overpaid Fox by $2,446.00.

** Although the amount on the invoice in evidence was $6,109.40, Plaintiff's Exhibit 16 indicates that this amount is $6,551.40, and Plaintiff's counsel in closing argument stated that the Tri–State bill was approximately $400 higher.

