F.E. GATES COMPANY, DIVISION OF the BLAKLEY CORPORATION, Appellant–Defendant/Counterclaim Plaintiff,

v.

HYDRO–TECHNOLOGIES, INC., Appellee–Plaintiff/Counterclaim Defendant.

No. 02A03–9812–CV–505.

Court of Appeals of Indiana.

Jan. 28, 2000.

Rehearing Denied April 4, 2000.

Sydney L. Steele, Christina D. Arvin, Lowe Gray Steele & Darko, LLP, Jon D. Krahulik, Yosha Krahulik & Levy, Indianapolis, Indiana, Attorneys for Appellant.

Andrew C. Charnstrom, Wooden & McLaughlin, LLP, Indianapolis, Indiana, Attorney for Appellee.

## OPINION

BROOK, Judge.

### Case Summary

F.E. Gates Company, a division of the Blakley Corporation ("Gates"), appeals from a jury verdict in favor of Hydro–Technologies, Inc. ("Hydro–Tech") on Hydro–Tech's claim for wrongful termination of a subcontract.

We affirm.

### Facts and Procedural History

Gates raises three issues for our review, which we consolidate and restate as:

(1) whether the trial court erred when it denied Gates' motions for judgment on the evidence; and

(2) whether the trial court properly instructed the jury.

### Facts and Procedural History

Hydro–Tech is a specialty contractor in the field of hydrodemolition, a process by which concrete is removed using high pressure water. Hydrodemolition is accomplished through the use of a robot, a wheeled vehicle hydraulically driven and capable of delivering 13,000 to 14,000 pounds of water pressure per square inch. The robot must be calibrated with fixed pressure and flow rates such that the desired depth of sound concrete can be removed. Once the robot's calibrations are set, however, all structurally unsound concrete will be removed automatically regardless of depth.

On July 16, 1996, Gates contacted Hydro–Tech concerning renovations at a parking garage located in Fort Wayne, Indiana and owned by NBD Bank, NA ("NBD"). At that time, Gates was in the process of negotiating a contract ("Prime Contract") with NBD to act as general contractor to the renovation project, which

included removing approximately 40,000 square feet of concrete and resurfacing the badly deteriorated garage floor decks. The Prime Contract was signed on August 30, 1996.

On September 10, 1996, Gates and Hydro–Tech executed a subcontract ("Subcontract") providing for the hydrodemolition of the garage floor decks. The Subcontract between Gates as general contractor and Hydro–Tech as subcontractor consists of three parts: (1) an American Institute of Architects Standard Form of Agreement Between Contractor and Subcontractor ("Agreement"); (2) a Special Agreement Between Contractor and Subcontractor entitled Exhibit A ("Exhibit A"); and (3) a Hydrodemolition Agreement and Operational Plan entitled Exhibit B ("Exhibit B"). The preamble to Exhibit B sets forth the following:

> WHEREAS, Contractor requires surface removal utilizing hydro equipment. WHEREAS, the standard depth of removal required under this Agreement is not to exceed 3 inches.

Exhibit B further provides that the basic unit price for removal of up to three inches of concrete is $4.75 per square foot, and identifies an additional unit price of $1.58 to be paid "as applicable" for each inch or fraction of an inch of removal that exceeds three inches.

In addition, Article 1.1 of the Agreement reads as follows:

> The Subcontract Documents consist of (1) this Agreement; (2) the Prime Contract, consisting of the Agreement between the Owner and Contractor and the other Contract Documents enumerated therein, including conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of the Agreement between the Owner and Contractor and Modifications issued subsequent to the execution of the Agreement between the Owner and Contractor, whether before or after the execution of this Agreement, and other Contract Documents, if any, listed in the Owner–Contractor Agreement; (3) other documents listed in Article 16 of this Agreement; and (4) Modifications to this Subcontract issued after execution of this Agreement. *These form the Subcontract, and are as fully a part of the Subcontract as if attached in this Agreement or repeated herein.* The Subcontract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Subcontract Documents, other than Modifications issued subsequent to the execution of this Agreement, appears in Article 16.

(Emphasis added). The Prime Contract, in turn, incorporates documents containing the technical specifications by which renovations are to be performed, including Document 02630 ("Hydrodemolition Surface Preparation"), which provides:

**1.6 CALIBRATION AND TESTING OF HYDRODEMOLITION EQUIPMENT**

 A. Trial area will be designated by Engineer to demonstrate that equipment, personnel and methods of operation are capable of producing results satisfactory to Engineer. Trial area shall consist of 2 sections, approximately 200 sq. ft. each, one section deteriorated concrete and one section sound concrete.

 B. In sound concrete area, adjust equipment to remove 2 in. to 3 in. of concrete. Two passes may be required.

 C. After completion of the above test section, equipment shall be located over deteriorated concrete and using same parameters for sound concrete removal, used to remove all deteriorated concrete. If sufficient result is obtained, parame-

ters shall be used for production removal.

### 1.7 OPERATION OF HYDRODE-MOLITION EQUIPMENT

A. Once operating parameters of hydrodemolition equipment are defined and calibrated, they shall not be changed as machine progresses across parking deck, in order to prevent unnecessary removal of sound concrete below required minimum removal depth. Contractor shall exercise care to avoid removal of sound concrete below required depth. . . .

### 1.8 CONCRETE REMOVAL

A. All concrete within marked boundaries shall be removed to minimum depth shown on Drawings using hydrodemolition techniques. Concrete shall be removed to depth of ¾ in. below lowest top reinforcement. Removals shall be performed in a manner that avoids excessive concrete removals between reinforcement. . . .

C. If floor delaminations exist beyond minimum removal depth, removals shall continue until all unsound and delaminated concrete has been removed from cavity.

Hydro–Tech commenced its first shift of operations the evening the Subcontract was executed. At no time did Hydro–Tech remove more than three inches of sound concrete; all removal depths greater than three inches occurred within corroded and deteriorated areas. Gates found the depths of removal unacceptable, however, and insisted that only three inches of concrete, whether sound or unsound, be removed. It advised Hydro–Tech that unless Hydro–Tech could obtain removals "not to exceed 3 inches," the Subcontract would be terminated. Hydro–Tech responded that it was impossible for the hydrodemolition equipment to remove only three inches of deteriorated concrete and

that to continually recalibrate the robot would be in violation of both the Subcontract and standard trade practices. As a result of this dispute, Hydro–Tech was prohibited from carrying out further demolition of the garage floor decks and removed its equipment from the job site on September 17, 1996.

On January 24, 1997, Hydro–Tech filed a complaint against Gates alleging the general contractor's wrongful termination of the Subcontract. In response, Gates filed a counterclaim against Hydro–Tech for breach of contract. At the jury trial, Gates maintained that the maximum depth of removal dictated by the Subcontract was three inches; that this provision was clear and unambiguous; and that as a matter of law Hydro–Tech breached the Subcontract by removing more than three inches of concrete in many areas of the garage. Hydro–Tech maintained that the Subcontract clearly and unambiguously required it to remove *all* unsound concrete regardless of depth, and to remove only sound concrete to a maximum depth of three inches.

Following the presentation of Hydro–Tech's case-in-chief, Gates moved for judgment on the evidence. The trial court denied Gates' motion, and Gates proceeded with its case. The jury rendered a verdict in favor of Hydro–Tech in the amount of $220,000 and further found in favor of Hydro–Tech on Gates' breach-of-contract counterclaim. The trial court entered judgment on the jury's verdict. Thereafter, Gates filed a motion to correct error and renewed its motion for judgment on the evidence, both of which the court denied. Gates now appeals.

### Discussion and Decision

#### I. Motions for Judgment on the Evidence

Gates initially contends that the trial court erred when it denied its motion for judgment on the evidence at the close of Hydro–Tech's case-in-chief and again following the jury's verdict. When review-

902

ing a trial court's denial of a motion for judgment on the evidence, this Court will consider only the evidence most favorable to the nonmovant along with all reasonable inferences to be drawn therefrom. *TRW, Inc. v. Fox Development Corp.*, 604 N.E.2d 626, 629 (Ind.Ct.App.1992), *trans. denied.* Thus, our role on appellate review is no different from that of the trial court. *Id.* Judgment on the evidence is available only where the evidence is unconflicting and susceptible to but one inference supporting a judgment for the movant. *Fricke v. Gray*, 705 N.E.2d 1027, 1032 (Ind.Ct.App. 1999), *trans. denied.* If there is evidence on each element of the claim, the issue shall be tendered to the jury, and a motion for judgment on the evidence is properly denied. *Id.*

■ Here, the trial court determined as a matter of law that the Subcontract contained several ambiguities to be resolved by the trier of fact. The court instructed the jury that a reasonable person could find the Subcontract subject to more than one interpretation in that:

1. The contract document provides in paragraph 1.01 of Exhibit "B" to the contract document that "Hydro–Technologies, Inc. agrees to provide hydro demolition equipment for use in the completion of hydro demolition services required by the Agreement." The work of Hydro–Technologies, Inc. "required by this Agreement" is described on the first page of that Agreement as follows: "Contractor [F.E. Gates Company] requires surface removal utilizing hydro equipment" and "the standard depth of removal required by this Agreement is not to exceed 3 inches."

2. The parties' contract document includes a provision for additional pay-

ment by F.E. Gates Company. In paragraph 3.02 of Exhibit "B" to the contract document, it is provided that F.E. Gates Company "shall pay, as applicable, one or more Additional Unit Prices, as set forth below, for removals that exceed three (3) inches in depth."

3. The contract document does not describe when or under what circumstances the additional pay provision in paragraph 3.02 is "applicable," nor when, under what circumstances, and to what depths, it is acceptable that removals "exceed three (3) inches in depth." . . .

5. The specification [contained in Document 02630] [1] appears to be inconsistent with the requirement that "the standard depth of removal required by the Agreement is not to exceed 3 inches." Further, neither the specification nor other portions of the contract documents specify whether Hydro–Technologies, F.E. Gates Company, or the project engineer for the job, determines whether "sufficient result is obtained: as set forth in 1.6C,["] whether "unnecessary removal of sound concrete below the required minimum removal depth" has occurred as set forth in 1.7A, whether "excessive concrete removals between reinforcements" have occurred as set forth in 1.8A, and when "all unsound and delaminated concrete has been removed from cavity" as set forth in 1.8C. Further, the contract document is silent as to what is to be done to remedy such unsatisfactory results or occurrences and the effect of such unsatisfactory results on additional unit prices for removals that exceed 3 inches in depth.[2]

1. *See* Facts and Procedural History, *supra,* for recitation of pertinent specifications contained in Document 02630, which the trial court quoted at length but which we have not restated here to avoid redundancy.

2. This is an excerpt from the trial court's modified version of Gates' proposed Instruction No. 6 ("Instruction No. 6"). The remainder of Instruction No. 6 is set forth and fur-

■ We agree with the assessment of the trial court. While interpretation of a contract is a question of law for the court in most cases, extrinsic circumstances and rules of contract construction may be employed to help construe an ambiguous contract and ascertain the intent of the parties. *Ruff v. Charter Behavioral Health System of Northwest Indiana, Inc.*, 699 N.E.2d 1171, 1176 (Ind.Ct.App.1998), *trans. denied.* A contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning. *First Federal Savings Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind.1990). If a contract is ambiguous or uncertain and its meaning is to be determined by extrinsic evidence, its construction is a matter for the fact finder. *Id.* The evidence regarding the meaning of the Subcontract and the obligations that it imposed upon Hydro–Tech was conflicting, as the trial court surmised, and not susceptible to but one inference in favor of Gates. Accordingly, the trial court did not err in allowing the case to proceed to the jury.

## II. Jury Instructions

■ Gates next claims error in the trial court's giving of Instruction No. 6, which informed the jury that as a matter of law the Subcontract "contains ambiguities and that a reasonable person would find the contract subject to more than one interpretation;" delineated the pertinent specifications found in Document 02630;[3] and then set forth the various rules of contract construction.[4] Specifically, Gates contends that the specifications referenced in the Prime Contract and quoted to the jury were never part of Hydro–Tech's obligations under the Subcontract with Gates, and as such, the trial court's decision to instruct the jury on those specifications was improper. We disagree. Article 1.1

ther discussed in Section II of our Discussion and in footnote 4, *infra.*

3. *See* Facts and Procedural History and footnotes 1 and 2, *supra.*

4. The statement of the law found in Instruction No. 6 reads:

You are instructed that any resolution of these ambiguities must be based upon extrinsic evidence, or evidence outside the contract document itself.

When terms of a contract are ambiguous and uncertain and must be determined by evidence outside the contract document, as here, the meaning of the ambiguous term becomes a question of fact for you the jury. You are to interpret such ambiguous term to give effect to the intent of the parties at the time the contract was made, as reflected by the language that was used, based upon the facts and surrounding circumstances that existed at the time the contract was made.

You should consider the nature of the agreement, together with all the facts and circumstances leading up to the execution of the contract, the relation of the parties, the nature and situation of the subject matter, and the apparent purpose of making the contract.

In determining what the parties intended by the use of ambiguous terms, the subjective intent of only one of the parties cannot guide you in the interpretation of the contract. The parties' intention, which controls in interpreting a contract, is not the secret design in one party's mind, but the intention expressly declared or flowing, patently to all, from the nature and character of the act and the purposes to be served. Where there is doubt, the contract will be interpreted in the sense that one party knew, or had reason to know, that the other party understood the contract.

The entire contract must be read together and given meaning if possible, and words, phrases, sentences, paragraphs and sections cannot be read alone. You should not lift isolated clauses out of their context and consider them without reference to the contract as a whole, and the facts and circumstances existing when the contract was made. No part of a contract should be treated as redundant or surplusage if a meaning reasonable and consistent with the other parts can be given. A literal or technical construction of an isolated clause should not be indulged to defeat the true meaning.

The construction that is to be adopted in construing a contract is one which appears to be in accord with justice and common sense and the probable intention of the parties in light of honesty and fair dealing and to accomplish and serve the purpose intended by the parties as disclosed by the evidence.

of the Agreement provides unequivocally that "the Prime Contract ... and other Contract Documents enumerated therein, including ... Specifications ... are as fully a part of the Subcontract as if attached ... or repeated herein." Thus, Instruction No. 6 was both factually and legally correct. *See Jacobs v. State*, 640 N.E.2d 61, 66 (Ind.Ct.App.1994) (instruction must be correct statement of the law, be supported by evidence adduced at trial, and relevant to issues jury must decide in reaching verdict). The manner of instructing a jury lies within the sound discretion of the trial court, whose ruling will not be reversed unless the instruction, taken as a whole, misstates the law or otherwise misleads the jury. *Id.* We find no error with Instruction No. 6.

 Gates also argues that the court erred when it refused to give the following jury instructions which Gates tendered at trial:

### INSTRUCTION NO. 4

[I]f you find that Hydro–Technologies, Inc. failed to provide hydrodemolition and services for surface removal to the standard depth of removal that was not to exceed three inches, or refused to allow its operator to use the hydrodemolition equipment to achieve or attempt to achieve that depth of removal, then you may also find that Hydro–Technologies, Inc. has breached its contract with F.E. Gates Company.

### INSTRUCTION NO. 15

The agreement between Hydro–Technologies and F.E. Gates Company is clear and unambiguous that Hydro–Technologies was obligated ... to a standard depth of removal not to exceed three inches. The evidence is undisputed that Hydro–Technologies failed or refused to operate or allow its hydrodemolition equipment to remove concrete at a standard depth of removal not to exceed three inches, and, for that rea-

son, Hydro–Technologies breached its agreement with F.E. Gates Company.

F.E. Gates is therefore discharged from any liability to Hydro–Technologies.

### INSTRUCTION NO. 16

The sole issue for you to determine is the damages to be awarded to F.E. Gates Company for Hydro–Technologies' breach of the agreement between Hydro–Technologies and F.E. Gates Company.

Because we hold that the trial court's denial of Gates' motions for judgment on the evidence was proper in light of the ambiguities present in the Subcontract requiring resolution by the trier of fact, we likewise hold that the court's refusal to give Gates' tendered instructions was proper. Indeed, the instructions proposed by Gates were neither accurate nor supported by the evidence. *Cf. Fricke*, 705 N.E.2d at 1032 (court's refusal to give tendered instructions on contractual ambiguity not error where court determined contract was unambiguous as matter of law, and thus no evidence existed to support giving of such instructions).

 Moreover, Instructions No. 15 and No. 16 are tantamount to mandatory instructions that "attempt to set up a [detailed] factual situation" and direct the jury to reach a verdict against Hydro–Tech. *See Keith v. Mendus*, 661 N.E.2d 26, 37 (Ind.Ct.App.1996), *trans. denied.* We look with disfavor upon the use of mandatory instructions because of the risk involved in making a statement of the evidentiary facts under which the law would mandate a certain result. *Perry v. Goss*, 253 Ind. 603, 605, 255 N.E.2d 923, 925 (1970). "In order to properly instruct a jury it is necessary that the court state general propositions of law and their application to the case." *Id.* In sum, the trial court in this instance properly refused to

instruct the jury as Gates requested. We find no error.

Affirmed.

NAJAM and ROBB, JJ., concur.